# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

THE PICTSWEET COMPANY,      )
     )
      Plaintiff,      )
     )
v.      )      **Case No. 3:19-cv-00722**
     )      **Judge Aleta A. Trauger**
R.D. OFFUTT FARMS CO. *et al.*,      )
     )
      Defendants.      )

## MEMORANDUM

Plaintiff The Pictsweet Company ("Pictsweet") initiated this lawsuit by filing a complaint in state court in 2018, which it dismissed and then refiled in July 2019. (Compl., Doc. No. 1-4; *see also* Doc. No. 104 ¶ 102).) The defendants removed the case to federal court on the basis of diversity jurisdiction on August 19, 2019. (Doc. No. 1.) The plaintiff subsequently amended the Complaint twice, the first time to modify the allegations relating to jurisdiction and venue and to add a federal cause of action under the Lanham Act (*see* Motion to Amend, Doc. No. 38; First Am. Compl., Doc. No. 41), and the second time to add two new defendants and new factual allegations in support of its claims (*see* Motion to Amend, Doc. No. 101; Second Am. Compl., Doc. No. 104). The Second Amended Complaint ("SAC") asserts thirteen counts against five defendants: R.D. Offutt Company ("RDO North Dakota"), R.D. Offutt Farms Co. ("RDO Farms"), R.D. Offutt Company – Northwest ("RDO Northwest") (collectively with RDO North Dakota and RDO Farms, the "RDO defendants"), Northwest Frozen, LLC ("Northwest Frozen"); and CRF Frozen Foods, LLC ("CRF").

Now before the court are the RDO defendants' and Northwest Frozen's Motion to Dismiss under Rule 12(b)(6) (Doc. No. 111), which CRF joins in part (*see* Doc. No. 112), and Pictsweet's Motion to Strike Exhibit 1 to the Motion to Dismiss (Doc. No. 125). In its Response to the Motion to Dismiss, Pictsweet expressly "agrees" to the dismissal of Count Thirteen of the SAC, for intentional interference with business relations against the RDO defendants, and to the dismissal of all claims against Northwest Frozen, thus obviating the need for any discussion of the arguments in Parts II and III of the Memorandum in Support of the Motion to Dismiss. (Doc. No. 124, at 5.) Otherwise, Pictsweet opposes dismissal of any of its other claims. The RDO defendants filed a Reply in support of their Motion to Dismiss. (Doc. No. 129.) The plaintiff, with permission, filed a Sur-Reply in further opposition to the Motion to Dismiss. (Doc. No. 134.)

Pictsweet filed its Motion to Strike separately, arguing that the copy of a 2013 Asset Purchase Agreement attached as an exhibit to the RDO defendants' motion should be stricken, because it is not referenced in the SAC and is outside the scope of the pleadings. The RDO defendants filed a Response in Opposition to the Motion to Strike. (Doc. No. 130.)

For the reasons set forth herein, the Motion to Strike will be denied, and the Motion to Dismiss will be granted in part and denied in part.

## I.    FACTS AS ALLEGED IN THE SECOND AMENDED COMPLAINT

### A.    The Parties

Defendant RDO North Dakota is a North Dakota corporation whose principal place of business is in North Dakota. It began operating as a holding company in February or March 2016. (SAC, Doc. No. 104 ¶ 3.) RDO Farms is a Minnesota corporation whose principal place of business is in Fargo, North Dakota. (*Id.* ¶ 2.) RDO Northwest is an Oregon corporation with its principal place of business in Boardman, Oregon. (*Id.* ¶ 4.) RDO Northwest is the "wholly owned and controlled subsidiary of RDO Farms and/or RDO North Dakota." (*Id.*) Defendant CRF is a

Delaware limited liability company with its headquarters in Pasco, Washington. (*Id.* ¶ 5.) It is alleged to be a "wholly owned and controlled subsidiary of RDO Farms, RDO Northwest and/or RDO North Dakota." (*Id.*) CRF, at all relevant times, was in the business of "producing, preparing, processing and selling frozen vegetables to frozen vegetable producers, processers, repackers, distributors and wholesale and retail re-sellers, including Pictsweet, for human consumption." (*Id.*)

Plaintiff Pictsweet is a Delaware corporation with its principal place of business in Bells, Tennessee. It is engaged in the business of "producing, packaging, distributing and selling frozen vegetables" to various wholesale and resale customers, including grocery store operators such as The Kroger Co. ("Kroger"). (*Id.* ¶ 1.)

### B.     Pictsweet's Contractual Relationship with CRF

Prior to engaging in a contractual relationship with CRF, Pictsweet, for many years, bought frozen vegetables from Bybee Foods, LLC ("Bybee"), which operated out of a facility located in Pasco, Washington (the "Pasco facility"). (*Id.* ¶ 27.) Pictsweet and Bybee entered into a Supply Agreement in 2009, pursuant to which Pictsweet bought frozen vegetables from Bybee. Bybee warranted that any product sold by it would be "wholesome, merchantable and fit for human consumption," and both parties agreed to notify the other if they became aware of any "action by any federal, state or local authority or regulatory agency that relates to the quality or merchantability of Product" or of any contamination or adulteration of the product. (*Id.* ¶ 29.) The 2009 Supply Agreement was accompanied by a Continuing Product Guaranty, pursuant to which Bybee guaranteed the quality of its products. It provided subsequent Continuing Product Guaranties in 2012 and 2013. (*Id.* ¶ 30.) In accordance with the Continuing Product Guaranties, each of the purchase orders used by Pictsweet included "representations and warranties providing that Bybee would conduct pathogen testing on all finished products," making Bybee contractually obligated to test and analyze its products to ensure that they were not contaminated or adulterated

and were safe, wholesome, and fit for human consumption. (*Id.* ¶¶ 32–33.) While Pictsweet was engaged in business with Bybee, Pictsweet had no known instances of contamination of its products by the bacterium *Listeria monocytogenes* ("*Listeria*"). (*Id.* ¶ 28.)

In May 2013, RDO Northwest and CRF entered into a Lease, Sublease and Option Agreement with Bybee ("Lease"), pursuant to which RDO Northwest and CRF assumed responsibility for the Pasco facility that Bybee had been leasing, with an option to purchase it, and also assumed Bybee's obligations to Pictsweet under the 2009 Supply Agreement. In November 2014, RDO Northwest and CRF entered into an Asset Purchase Agreement with Bybee, pursuant to which Bybee sold the Pasco facility and transferred the 2009 Supply Agreement to RDO Northwest and CRF. (*Id.* ¶¶ 35–37.) Pictsweet alleges "upon information and belief" that RDO Farms directed and authorized the lease and subsequent purchase of Bybee's assets by RDO Northwest and CRF. (*Id.* ¶ 36.)

Bybee's transfer of the 2009 Supply Agreement to CRF and RDO Northwest required Pictsweet's consent. (*Id.* ¶ 37.) Pictsweet gave its consent, based on its "reliance on numerous oral and written assurances by RDO Northwest, CRF and/or RDO Farms that CRF would fully perform Bybee's obligations under the terms of the 2009 Supply Agreement and any purchase orders issued by Pictsweet thereunder" and based on "oral and written assurances of RDO Northwest, CRF and/or RDO Farms that Pictsweet—through CRF—effectively would be doing business with RDO Farms, which was well known in the industry." (*Id.* ¶ 37.)

Although it claims to have received these "assurances" from "RDO Northwest, CRF and/or RDO Farms" (*id.*), Pictsweet identifies these "numerous oral and written assurances" as follows:

> 1) a May 6, 2013 email from Kevin Sund of CRF (and RDO Northwest and RDO Farms as its alter egos) to all customers, including Rick Holdren of Pictsweet, stating "as of May 3rd, the R.D. Offutt Co. (CRF Frozen Foods, LLC) acquisition of Bybee Foods is Complete!" In this same email, Kevin Sund of CRF (and RDO

Northwest and RDO Farms, as its alter egos) also represented to Rick Holdren of Pictsweet that the acquisition of Bybee was a purchase of assets by "R.D. Offutt Company," omitting the truth that it was, in fact, a lease of Bybee's assets by RDO Northwest and CRF (and RDO Farms as their alter ego) with an option to buy and, thus the acquisition was not complete. Further, RDO Northwest and CRF (and RDO Farm as their alter ego) had approximately a year and a half to exercise the option to terminate the lease and/or the option to purchase, with RDO Farms having the sole discretion and control over their decision to exercise those options or not; 2) a May 20, 2013 email from Kevin Sund of CRF (and RDO Northwest and RDO Farms as its alter egos) noting that "CRF acknowledges and accepts" Pictsweet's open and outstanding Purchase Orders with Bybee which "were written in the spirit" of the 2009 Supply Agreement; and 3) a conversation between Kevin Sund on behalf of CRF, RDO Northwest and/or RDO Farms and Rick Holdren and Rick Thomas of Pictsweet, on or about February 26, 2013, at the AFFI Convention in Anaheim, California where Kevin Sund stated that "R.D. Offutt Company" would be taking over Bybee. Kevin Sund made this statement at the direction and approval of Martin Myers, who is the General Manager of the Western Region of RDO Farms and the owner of RDO Northwest. Upon information and belief, in making the foregoing assurances, Kevin Sund was acting at the direction, authorization and control of RDO Northwest and RDO Farms.

(*Id.* ¶ 38.)

Pictsweet alleges that, by Kevin Sund's making these representations, CRF—and RDO Northwest and RDO Farms as its alter egos—assumed responsibility for the entire contractual relationship between Bybee and Pictsweet, including obligations for purchase orders issued by Pictsweet in 2014 and 2015. (*Id.* ¶¶ 40–42.)[1]

## C. *Listeria* Contamination

Shortly after CRF took over Bybee's business operations, CRF and the RDO defendants became aware that vegetable products processed at CRF's Pasco facility had tested positive for *Listeria* or "exceeded an IEH[2] Process Control Test ('PCT') value of 9," meaning that they knew

---

[1] Pictsweet explains that it purchased bulk frozen vegetables from CRF, which it then mixed with frozen vegetable products purchased from other suppliers, repackaged, and sold to its own customers under Pictsweet's branded lines or under the private label brands of Pictsweet's customers such as Kroger's "Kroger®" brand of frozen vegetable products. (Doc. No. 104 ¶ 42.)

[2] Pictsweet does not indicate what the initials "IEH" signify. This may be the name of the "outside microbiological testing laboratory" referenced in paragraph 92 of the SAC.

the products were "adulterated," and they affirmatively chose not to notify Pictsweet of the *Listeria*-positive test results. (*Id.* ¶¶ 43–45.) Instead, CRF continued selling frozen food products to Pictsweet. (*Id.* ¶ 44.)

More specifically, the plaintiff alleges that: (1) by June 2013, tests performed by an outside microbiological testing laboratory engaged by CRF found that frozen green peas processed at CRF's Pasco facility were positive for *Listeria*; (2) during 2013 generally, numerous lots of CRF finished product tested positive for *Listeria*; (3) on or before March 2014, CRF had received positive *Listeria* tests on at least 164 lots of frozen vegetables product; (4) on or before March 9, 2015, CRF received positive *Listeria* test results on numerous lots of its product; (5) from May to December 2015, CRF received numerous positive test results for *Listeria* on "environmental swabs" taken from CRF's Pasco facility"; and (6) RDO Northwest and RDO Farms were aware of each of these test results. (*Id.* ¶ 92.)

In addition, CRF and the RDO defendants failed to notify Pictsweet that CRF engaged in a product delivery protocol pursuant to which CRF, instead of destroying product known to have tested positive for *Listeria* contamination or to have a PCT score in excess of 9, intentionally delivered the product to Pictsweet and other customers "whose contracts did not *specifically* ask for finished product pathogen testing," without informing these customers that they were receiving "adulterated" products. (*Id.* ¶ 45.) CRF and the RDO defendants failed to notify Pictsweet of this protocol. Pictsweet asserts that the RDO defendants "were contemporaneously aware of, ratified, engaged or participated in and/or caused CRF to utilize this product delivery protocol and distribution of [*Listeria*] contaminated and 'adulterated' products." (*Id.* ¶ 46.)

In April 2013, Pictsweet and Bybee entered into purchase orders pursuant to which Bybee agreed to sell and Pictsweet agreed to buy millions of pounds of frozen bulk green peas. Bybee

assigned these purchase orders to CRF when CRF acquired Bybee, and Pictsweet consented to the assignment. Despite CRF's knowledge that its product had tested positive for *Listeria*, CRF and Pictsweet entered into additional purchase orders in April 2014 and August 2015 for the purchase of frozen bulk green peas and frozen bulk green beans. (*Id.* ¶¶ 75–79.) Each of these purchase orders contained express warranties by CRF regarding the products' wholesomeness and fitness for human consumption, language regarding the seller's obligation to notify the buyer (Pictsweet) of any "significant issues" relating to the products, and indemnification provisions requiring CRF to indemnify Pictsweet for any claims against it relating to injury caused by the products. (*Id.* ¶ 81.) CRF was also required to maintain liability insurance. (*Id.*) Pictsweet relied on CRF's representations and warranties to enter into other purchase orders for other products. (*Id.* ¶¶ 83–84.)

In reliance on the promises, representations, and warranties by CRF and RDO Northwest, Pictsweet continued to do business with CRF and purchased other products from CRF during the same time frame. As part of its business operations, Pictsweet purchased green beans and green peas from CRF and packaged them, including by mixing them with Pictsweet's other frozen vegetable products, which Pictsweet then sold to its own customers, including Kroger, which customers then sold the products at retail to consumers for human consumption. (*Id.* ¶¶ 83, 84.) CRF anticipated these uses and knew that its products would be consumed by individuals without further processing by Pictsweet, aside from packaging. (*Id.* ¶¶ 85–86.) And it and the RDO defendants knew "or should have known" at the time CRF delivered frozen peas and green beans to Pictsweet that the products were adulterated, not merchantable, and could be subject to a recall. (*Id.* ¶ 93.)

In March or April 2016, the CDC and the FDA began investigating reported instances of illnesses related to *Listeria* in various parts of the United States and soon determined that the strains of *Listeria* causing illness were "closely related to strains" of *Listeria* detected in vegetables processed at CRF's Pasco facility. (*Id.* ¶ 87.) CRF thereafter issued two voluntary nationwide recalls of its frozen vegetable products. The first recall impacted only eleven food products, none of which implicated Pictsweet. The second recall "impacted 432 products and included Pictsweet products." (*Id.* ¶ 88.) However, according to Pictsweet, the "second recall," for undisclosed reasons, also included products that were *not* contaminated and did *not* violate "any contractual obligation [CRF] had with Pictsweet." (*Id.*) CRF knew, however, that, once it issued a recall of products it had sold to Pictsweet, Pictsweet would be required to issue its own recall, "which would communicate to Pictsweet's customers that the product Pictsweet had delivered was contaminated and not merchantable," even if the product, in fact, was not contaminated and was fit for human consumption. (*Id.*) CRF's recall involved a total of 720,128 pounds of green peas delivered to Pictsweet in 2014, for which Pictsweet had paid $331,185.47, and 3,508,264 pounds of frozen green beans delivered to Pictsweet from 2014 through 2016, for which Pictsweet had paid $1,409,943.50. (*Id.*) Because of CRF's recall, Pictsweet, as required by law, issued its own recall of products that either contained or could contain CRF green beans and green peas. Pictsweet's customers, including Kroger, were then required to issue their own recalls. (*Id.*)

### D. Alter Ego Liability

As previously indicated, Pictsweet does not seek simply to hold CRF liable for breach of contracts and warranties relating to Pictsweet's purchase of contaminated or potentially contaminated products and the subsequent recalls. Instead, it also seeks to hold all of the RDO

defendants liable as well, based on an *alter ego* theory of liability.[3] In support of that theory, the plaintiff alleges very broadly that RDO Farms and/or RDO North Dakota "controlled and control RDO Northwest's business affairs and . . . operations," including "RDO Northwest's control over CRF," and "had knowledge of, ratified, engaged or participated in, or caused RDO Northwest to commit the acts and omissions of RDO Northwest" as alleged in the SAC, "as well as those acts or omission of CRF which RDO Northwest had knowledge of, ratified, engaged in and/or participated in." (*Id.* ¶ 6.) RDO Northwest owned a 97.5 percent membership interest in CRF, and Martin Myers held a 2.6 percent membership interest in CRF.[4] Myers is also the General Manager of Farming Operations for "the Western Region of 'R.D. Offutt Company," and any and all actions taken by him . . . was [sic] done on behalf of RDO Farms and/or RDO North Dakota." (*Id.* ¶ 7.) The plaintiff further alleges that, "[a]t all relevant times, RDO Farms, RDO North Dakota and/or RDO Northwest controlled CRF's business affairs and its operations, including CRF's acts and omissions alleged herein. These companies had knowledge of, ratified, engaged or participated in, or caused CRF to commit, the acts and omissions of CRF alleged herein." (*Id.* ¶ 7.)

The plaintiff contends that the RDO defendants were all "alter egos of CRF," exercised complete dominion over CRF's finances, business practices, regulators' access to records of pathogen testing results, and CRF's obligations to its customers. (*Id.* ¶¶ 53, 54.) The RDO defendants allegedly used CRF to "work an injustice and perpetrate a fraud" regarding the *Listeria*-positive test results and "adulterated" food products, which were concealed from regulators, the

_____

[3] Although the factual allegations are somewhat vague on this point, under Count One of the SAC, Pictsweet clearly states that it entered into "valid and enforceable contracts" with CRF. (Doc. No. 104 ¶ 107.) It does not appear to be attempting to state contract-based claims against RDO Northwest directly (as opposed to indirectly, by way of its alter ego theory).

[4] The SAC also asserts both that RDO Farms is the parent corporation of RDO Northwest and CRF (*id.* ¶ 9) and that RDO North Dakota is and was the "holding company and majority shareholder" of RDO Farms, RDO Northwest, and CRF. (Doc. No. 104 ¶ 10.)

public, and customers in order to allow CRF to continue conducting business as usual and maximizing profits for the "joint enterprise" among it and the RDO defendants. (*Id.* ¶ 56.)

In support of the existence of this "joint enterprise," the plaintiff alleges that RDO Farms:

- Served as a co-borrower and guarantor of CRF's line of credit and loan with Wells Fargo Bank, N.A. because CRF possessed no independent credit rating;

- Caused other R.D. Offutt-related entities, without remuneration, to guaranty loans made in the name of CRF and/or to lend money from their own lines of credit to CRF without charging interest for said loans;

- Included CRF as a "Named Insured" per its "Broad Form Named Insured" Endorsement to its insurance policy with Zurich American Insurance Company;

- Maintained an excess insurance policy triggered upon the exhaustion of CRF's underlying insurance policy (or policies);

- Utilized a shared computer server with CRF (along with RDO North Dakota and RDO Northwest) with common access;

- Employed the same Chief Financial Officer and Human Resources personnel as CRF (along with RDO North Dakota and RDO Northwest);

- Provided employment benefits and pension plans under the same umbrella entity named "R.D. Offutt Company" as CRF (along with RDO North Dakota and RDO Northwest);

- Utilized the same Fargo, North Dakota office address location as CRF (along with RDO North Dakota and RDO Northwest);

- Employed the same Fargo-based personnel to obtain and maintain insurance policies as CRF (along with RDO North Dakota and RDO Northwest); and

- Utilized and maintained the same administrative policies and procedures as CRF (along with RDO North Dakota and RDO Northwest).

(*Id.* ¶ 56.)

In addition, the RDO defendants allegedly knew that Pictsweet was a customer of CRF and knew about the 2009 Supply Agreement, the purchase orders and Continuing Product Guaranty that were subject to the 2009 Supply Agreement, and CRF's contractual obligations to Pictsweet,

including the express and implied warranties of merchantability of the products it sold to Pictsweet. (*Id.* ¶ 58.)

Pictsweet alleges that CRF was required to obtain approval from RDO Farms for any capital improvements. Beginning in 2013, CRF began requesting food safety capital improvements to its facility in Pasco, Washington. (*Id.* ¶ 61.) Even though the RDO defendants purportedly knew by then about CRF's positive *Listeria* tests and other problems, they "failed to install corrective capital improvements" and either directed or caused CRF to use the product delivery protocol referenced above, pursuant to which CRF delivered adulterated product to Pictsweet and its other customers that did not require finished-product pathogen testing. (*Id.* ¶ 63.) Pictsweet alleges that the RDO defendants caused CRF to deny regulators access to its test results and to fail to provide notice to its customers about test results, plant conditions, and potential dangers. (*Id.* ¶¶ 64–65.)

Upon learning about the CDC and FDA investigation and "impending recall," the RDO defendants allegedly acted in their own self-interest and abused their power over CRF by "dissipating CRF's assets," in order to avoid CRF's having to fulfill its contractual and other obligations to Pictsweet and CRF's other customers. (*Id.* ¶ 67.) They did so by "making distributions of capital" to the RDO defendants and other affiliated entities, reducing CRF's equity by almost $100 million. (*Id.* ¶ 68.)

Pictsweet states that it is "informed and believes that RDO Farms and RDO Northwest liquidated their equity in CRF and transferred all CRF-related assets to RDO North Dakota and/or other R.D. Offutt-related entities to avoid CRF's obligations to Pictsweet, to commit a fraud upon Pictsweet and to cause injury and damages to Pictsweet." (*Id.* ¶ 69.) More specifically, on August 30, 2016, Capital VI, LLC, a Nevada limited liability company whose managing member is RDO Northwest, acquired a deed of trust recorded against CRF's Pasco facility related to a 2016 $25

million loan from Wells Fargo Bank to CRF (the "Pasco deed of trust"). In September 2016, Capital VI assigned the Pasco deed of trust to Threemile Canyon Farms, LLC, another RDO Northwest-affiliated entity, in exchange for a $25 million loan from Threemile Canyon Farms to Capital VI, "presumably to allow Capital VI to pay off CRF's Wells Fargo loan." (*Id.* ¶ 73.) In July 2017, CRF, at the direction of RDO Northwest, transferred the Pasco facility and property to Northwest Frozen, LLC (the defendant against which Pictsweet has agreed all claims should be dismissed), which was formed for the purpose of acquiring the Pasco property and facility. In March 2018, RDO Northwest announced that the Pasco facility would reopen under a new name, Simplot RDO, a joint venture between Northwest Frozen, LLC and J.R. Simplot Company. The transfer of the Pasco facility involved the conveyance of "a deed in lieu of foreclosure," but CRF was otherwise paid no consideration in exchange for the Pasco facility. (*Id.* ¶ 73.)

Further, besides claiming that the RDO defendants were the alter egos of CRF, Pictsweet contends that the RDO defendants were each "alter egos of each other," in that each RDO defendant was at all times "acting as an agent and/or employee or joint venture of each of the other defendants, and all times mentioned was acting within the course and scope of said agency and/or employment and/or joint venture with the full knowledge, permission and consent of each of the other Defendants. In addition, each of the acts and/or omissions of each Defendant alleged herein was made known to, and ratified by, each of the other Defendants." (*Id.* ¶ 11.) Pictsweet asserts that the RDO defendants "exercised complete dominion over each other in terms of finances, policy and business practices with respect to food safety, CRF's business operations, the handling of the 2016 food recall, and the dissipation of CRF's assets to avoid liability such that none of the entities had a separate mind, will or existence of its own." (*Id.* ¶¶ 49, 50.) In support of this arm of its alter ego theory, Pictsweet alleges that the RDO defendants at all times "held themselves out as

the same legal entity" named "R.D. Offutt Company" to "regulators, banks, the general public, and CRF's customers, including Pictsweet." (*Id.* ¶ 52.) Despite the apparently undisputed fact that RDO Northwest is an Oregon corporation whose principal place of business is in Boardman, Oregon, Pictsweet alleges that all three RDO defendants used the same Fargo, North Dakota office address; shared access to a common computer server; employed the same Chief Financial Officer and Human Resources personnel; used the "same Fargo-based" advisors to obtain and maintain insurance policies and to obtain "capital expenditure approval"; used the same administrative policies and procedures; and provided the same employment benefits and pension plans from an umbrella entity known as "R.D. Offutt Company." (*Id.* ¶ 52.)

### E. The *Coffelt* Litigation

In July 2016, a consumer class action, styled *Coffelt v. The Kroger Co., The Pictsweet Company, CRF Frozen Foods, LLC and DOES 1 through 25*, Case No. 5:16-cv-01471, was filed in the U.S. District Court for the Central District of California. The class action complaint, as later amended, asserted claims for breach of the implied warranty of merchantability, negligence, breach of contract, and violation of California state law relating to the plaintiffs' purchases of frozen fruits and vegetables from the defendants named in the case. (Doc. No. 104 ¶¶ 98–99.)[5]

In March 2018, through discovery obtained in *Coffelt*, Pictsweet obtained from the FDA an Establishment Inspection Report for CRF's Pasco facility, from which it learned for the first time that CRF had concealed positive *Listeria* test results and PCT scores above 9 and that it had

---

[5] The claims as set forth in the First Amended Complaint in that case were based on allegations that the products grown, manufactured, packaged, and distributed by the defendants were adulterated with *Listeria*. *See 1st Am. Compl.* ¶¶ 13–24, *Coffelt v. The Kroger Co.*, No. 5:16-cv-01471 (C.D. Cal. Oct. 7, 2016), ECF No. 26. The *Coffelt* litigation was resolved on summary judgment in favor of the defendants on August 17, 2018, based on the plaintiff's lack of standing. *Coffelt v. The Kroger Co.*, No. EDCV 16-1471 JGB (KKx), 2018 WL 6004543 (C.D. Cal. Aug. 17, 2018).

engaged in a protocol pursuant to which it redirected and shipped product that it knew was contaminated to Pictsweet and other customers that did not require finished-product pathogen testing. (*Id.* ¶ 100.) It also learned through discovery conducted in *Coffelt* that "CRF's representations about [*Listeria*] contaminated products was [sic] inaccurate, and that a large portion of the frozen green peas and beans CRF had supplied to Pictsweet were <u>not</u> contaminated by [*Listeria*]." (*Id.* ¶ 101 (emphasis in original).) Based on these discoveries, Pictsweet filed in Tennessee state court its initial lawsuit against CRF, RDO Northwest, and "R.D. Offutt Company" in June 2018. (*Id.* ¶ 102.)

Pictsweet asserts, based on information and belief, that CRF and the RDO defendants knew that "large portions" of the frozen green peas and green beans products that CRF had sold to Pictsweet were not contaminated with *Listeria*, but CRF and the RDO defendants nonetheless "included those products in [CRF's] second recall anyway to advance their own self-interests." (*Id.* ¶ 103.) CRF thus "intentionally misinformed Pictsweet regarding the contaminated nature of the frozen green peas and green beans it had purchased from CRF," and the other RDO defendants were "aware of, ratified, engaged or participated in or caused CRF" to commit these purported misrepresentations to Pictsweet. (*Id.* ¶¶ 104, 105.)

## II.    MOTION TO STRIKE

With their Motion to Dismiss, the RDO defendants filed a copy of the May 2, 2013 Asset Purchase Agreement ("2013 APA") executed by and among CRF as "Purchaser," RDO Northwest as "Majority Holder," and Bybee as "Seller." (Doc. No. 111-2.) The 2013 APA documents Bybee's sale of "certain assets . . . relating to or used in the processing, packaging, repackaging, distribution and sale of organic and conventional frozen vegetables (the 'Business')" to CRF, including Accounts Receivable, inventory, finished goods, raw materials, packaging, seed, supplies, and Assigned Contracts. (Doc. No. 111-2, at 6, 14, 16.) In addition, the parties agreed that, at Closing,

Purchaser would enter into a five-year Lease, with purchase option, for the Real Property and Improvements, owned and leased equipment, and Intellectual Property of the Business ("Operating Assets") as identified in the 2013 APA. (Doc. No. 11-2, at 20.)

In their Memorandum in Support of the Motion to Dismiss, the RDO defendants recited, in the "Background" section, that CRF and RDO Northwest had entered into the 2013 APA with Bybee; that they, at the same time, executed the Lease, Sublease, and Option Agreement referenced therein; and that they later exercised their option under the Lease to purchase the Pasco Facility from Bybee." (Doc. No. 111-1, at 3 (citing Doc. No. 104 ¶¶ 35, 36[6]).) In a footnote, the RDO defendants state that the 2013 APA is attached as an exhibit to their filing and that "[d]ocuments referred to in the pleadings and integral to the claims may be considered on a motion to dismiss." (Doc. No. 111-1, at 3 n.1 (citing *Comm'l Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 335–36 (6th Cir. 2007)).) The Memorandum further asserts that, pursuant to the 2013 APA, CRF "took assignment of the [2009] Supply Agreement with Pictsweet's consent." (*Id.* at 3 (citing Doc. No. 104 ¶ 37.) The Memorandum does not contain any additional references to the 2013 APA (or, indeed, the 2014 APA).

Pictsweet moves to strike Exhibit 1, the 2013 APA. (Doc. No. 125.) It asserts that the 2013 APA is not referenced in the SAC, that only the 2014 APA is referenced therein, and, therefore, that the 2013 APA attached as Exhibit 1 to the Motion to Dismiss "should be stricken from the record in this case unless and until such time as its relevance to the matters pending before the Court is properly established." (Doc. No. 125, at 2.) In response, the RDO defendants dispute that

---

[6] Paragraph 35 of the SAC states that RDO Northwest and CRF entered into a Lease, Sublease and Option Agreement with Bybee on May 3, 2013. (Doc. No. 104 ¶ 35.) The next paragraph of the SAC references a November 2014 APA, pursuant to which RDO Northwest and CRF exercised their option to purchase the real property and other improvements that were the subject of the Lease, Sublease and Option Agreement. (Doc. No. 104 ¶ 36.)

the 2013 APA is not referenced in the SAC and further argue that the "version of the agreement" is not actually relevant to the issues raised by the defendants' Motion to Dismiss. (Doc. No. 130, at 1.) They attach to their Response the 2014 APA and request that the court either deny the Motion to Strike on the merits or deny it as moot.

This motion is an utter waste of the court's and the parties' time. As a threshold matter, the Federal Rules of Civil Procedure do not authorize the "striking" of documents attached to motions to dismiss. Motions to strike are governed by Rule 12(f), which provides that a court may strike certain matters "*from a pleading*." Fed. R. Civ. P. 12(f) (emphasis added). Neither a motion to dismiss nor an exhibit attached to it is a "pleading," as that term is defined by Rule 7(a). On that basis alone, the Motion to Strike is improper.

Even if the court construes the Motion to Strike as a motion to exclude evidence under Rule 12(d), it is without merit. Rule 12(d) provides that "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). The Sixth Circuit has taken a "liberal view" of matters falling within the pleadings for purposes of Rule 12(d). *Armengau v. Cline*, 7 F. App'x 336, 334 (6th Cir. 2001). The court may consider "the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (citing *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001)). Further, extrinsic materials that "'fill in the contours and details' of a complaint," too, may be considered without converting the motion to one for summary judgment. *Id.* (quoting *Yeary v. Goodwill Indus.-Knoxville, Inc.*, 107 F.3d 443, 445 (6th Cir. 1997)).

Under this standard, it is clear that the 2013 APA is not a matter outside the pleadings. Although the SAC expressly references only the Lease executed on May 3, 2013 and the 2014 APA, the factual allegations in the SAC make it clear that the May 3, 2013 Lease was executed in conjunction—and accordance—with the 2013 APA, and it was actually the 2013 APA pursuant to which Bybee assigned to CRF its contracts, including the 2009 Supply Agreement with Pictsweet, with Pictsweet's consent. The Lease and the 2014 APA primarily concern the transfer of the real estate, physical facility, equipment located thereon, and certain intellectual property. (*See* Doc. No. 130-1, at 45–59.) The 2013 APA (Doc. No. 111-2), on the other hand, concerns the transfer of Bybee's business and operating contracts and, as such, is absolutely central to Pictsweet's claims. Reference to it serves only to "fill in the contours and details" of the SAC. Having conducted substantial discovery in *Coffelt*, Pictsweet likely knows or should know this.

Regardless, the 2013 APA is simply not material to the Motion to Dismiss or this court's consideration of the parties' arguments for and against dismissal, except insofar as it confirms the plaintiff's allegations regarding the identity of the parties that entered into the transactions with Bybee. These are the same parties that entered into the 2014 APA, which is expressly referenced in the SAC. While the plaintiff has not provided a legitimate basis for formally excluding the exhibit, the court simply has no need to reference the 2013 APA (or the 2014 APA) in its consideration of the Motion to Dismiss.

For all these reasons, the Motion to Strike will be denied.

## III.    THE MOTION TO DISMISS

### A.    Standard of Review

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d

471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action"; instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556. According to the Supreme Court, "plausibility" occupies that wide space between "possibility" and "probability." *Iqbal*, 556 U.S. at 678. If a reasonable court can draw the necessary inference from the factual material stated in the complaint, the plausibility standard has been satisfied.

**B.    Discussion**

The RDO defendants' basic position is that the SAC fails to state colorable claims against them, as the plaintiff's factual allegations are insufficiently specific to establish that they could be liable, under an alter ego theory of liability, for damages arising from CRF's sale of *Listeria*-contaminated product to Pictsweet and CRF's later product recalls. They also assert that the claim that the RDO defendants are alter egos of each other is "nonsensical." (Doc. No. 111-1, at 15.) The

RDO defendants argue that the SAC fails to state direct claims against them for intentional misrepresentation or fraudulent concealment. In Part V of the Memorandum supporting their motion, which is joined by CRF, the RDO defendants contend that the statutory and tort claims are subject to dismissal because they are time-barred, barred by the economic loss doctrine, and, alternatively, are subject to dismissal under Rule 12(b)(6), as they are not alleged with sufficient factual support.

### 1. Alter Ego Liability

The defendants first assert that, because CRF is a Delaware limited liability company, Delaware law applies to Pictsweet's alter ego claims. The plaintiff agrees that Delaware law "may apply to the analysis of whether to pierce CRF's corporate veil," but it contends that Minnesota law applies to determining whether to pierce the corporate veil of RDO Farms, that North Dakota law applies to determinations of RDO North Dakota's liability, and Oregon law determines whether RDO Northwest's corporate veil can be pierced. (Doc. No. 124, at 7.) Pictsweet further contends that the threshold for liability in each of these other states is lower than that of Delaware law when it comes to alter ego liability. (*Id.*) It also argues, however, that, "because Pictsweet can satisfy the more specific standards found in Delaware and Tennessee, its alter ego claim should be allowed to proceed regardless of which state law is applied." (*Id.*)

### a) Legal Standards for Alter Ego Liability

It is a general principle of corporate law "deeply ingrained in our economic and legal systems that a parent corporation . . . is not liable for the acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61 (1998). "In certain situations, however, the corporate veil can be pierced, as a tool of equity, to disregard the existence of a corporation and impose liability on the corporation's individual principals and their personal assets." *Blair v. Infineon Techs. AG*, 720 F. Supp. 2d 462, 469 (D. Del. 2010) (citations omitted).

Pictsweet concedes that, under Tennessee's choice of law rules, Delaware law applies to the question of whether CRF's corporate veil should be pierced, as CRF is a Delaware limited liability company. *Accord Thomas v. Lytle,* 104 F. Supp. 2d 906, 927 (M.D. Tenn. 2000) ("Although the choice of which state's law is to be applied in a diversity case is determined by the law of the forum state, the state of incorporation has the greater interest in determining when and if the corporate veil is to be pierced." (quoting 1 Fletcher *Cyclopedia of Private Corporations* § 41.90 (perm. ed. rev. vol. 1999)), *aff'd*, 52 F. App'x 671 (6th Cir. 2002).

"To prevail on an alter ego claim under Delaware law, a plaintiff must show (1) that the organization and the parent company the plaintiff seeks to hold liable for the subsidiary's actions "operated as a single economic entity" and (2) that an "overall element of injustice or unfairness . . . [is] present." *In re Broadstripe, LLC,* 444 B.R. 51, 102 (Bankr. D. Del. 2010) (quoting *Harper v. Del. Valley Broadcasters, Inc.*, 743 F. Supp. 1076, 1085 (D. Del. 1990), *aff'd*, 932 F.2d 959 (3d Cir. 1991)). To determine whether two companies operate as a single economic entity, Delaware courts consider a number of factors, including:

> whether the corporation was adequately capitalized for the corporate undertaking; whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds; and whether, in general, the corporation simply functioned as a facade for the dominant shareholder.

*In re Foxmeyer Corp.*, 290 B.R. 229, 235 (Bankr. D. Del. 2003) (quoting *Harco Nat'l Ins. Co. v. Green Farms, Inc.*, CIV. A. No. 1131, 1989 WL 110537 at *4 (Del. Ch. 1989)). "While no single factor justifies a decision to disregard the corporate entity, some combination of the above is required, and an overall element of injustice or unfairness must always be present, as well." *Trevino v. Merscorp, Inc.*, 583 F. Supp. 2d 521, 528 (D. Del. 2008) (citation and internal quotation marks omitted).

Regarding the unfairness prong of the test, the plaintiff is not required to establish "fraud or a sham, strictly speaking," but "the requisite injustice or unfairness" is, at a minimum, "something that is similar in nature to fraud or a sham." *Id.* at 236 (citations omitted); *see also Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 268 (D. Del. 1989) ("Fraud or something like it is required."). Under Delaware law, corporate entities are disregarded only in "exceptional circumstances," and the party asking the court to disregard corporate form "bears the burden of proving that there are substantial reasons for doing so." *Mobil Oil*, 718 F. Supp. at 270 (citations and internal quotation marks omitted).

To the extent the plaintiff seeks to pierce the corporate veil of successive layers of corporate parentage—that is, to pierce RDO Northwest's corporate veil to hold RDO Farms and/or RDO North Dakota liable for RDO Northwest's wrongdoing—other states' laws might be relevant, but the veil-piercing law of the other jurisdictions to which the plaintiff points (Minnesota, North Dakota, and Oregon) is not substantially different from that of Delaware. In both Minnesota and North Dakota, the law on corporate veil piercing largely derives from *Victoria Elevator Co. of Minneapolis v. Meriden Grain Co.*, 283 N.W.2d 509 (Minn. 1979), which held that, for a veil-piercing theory to apply, the plaintiff must establish (1) disregard of the corporate entity and (2) "an element of injustice or fundamental unfairness." *Id.* at 512. The factors relevant to the determination of whether corporate form has been disregarded are similar to those invoked under Delaware law and include

> insufficient capitalization for purposes of corporate undertaking, failure to observe corporate formalities, nonpayment of dividends, insolvency of debtor corporation at time of transaction in question, siphoning of funds by dominant shareholder, nonfunctioning of other officers and directors, absence of corporate records, and existence of corporation as merely facade for individual dealings.

*Id.*; *see also Barton v. Moore*, 558 N.W.2d 746, 749 (Minn. 1997) (citing *Victoria Elevator Co.*, 238 N.W.2d at 512); *Coughlin Constr. Co., Inc. v. Nu-Tec Indus., Inc.*, 755 N.W.2d 867, 873 (N.D. 2008) (same).

Under Oregon law, "challenges to 'corporate form and its limited liability' will not be considered 'unless it is demonstrated to be an absolute necessity.'" *State ex rel. Neidig v. Superior Nat. Ins. Co.*, 173 P.3d 123, 131 (Or. 2007) (quoting *City of Salem v. H.S.B.*, 733 P.2d 890, 894 (Or. 1987)). Piercing the corporate veil is appropriate only if the entity whose veil the plaintiff seeks to pierce is a "a mere 'instrumentality' or 'alter ego' and where fraud and injustice has [sic] resulted." *Frontier Recovery, LLC v. Lane Cty.*, No. 09-6017-TC, 2009 WL 2253726, at *3 (D. Or. July 24, 2009) (quoting *Amfac Foods, Inc. v. Int'l Sys. & Controls Corp.*, 654 P.2d 1092, 1099 (Or. 1982)). Under Oregon law, to survive a motion to dismiss,

> a plaintiff must plead (and prove) three things to impose liability on a shareholder under the alter-ego theory: (1) the shareholder must have actually controlled or shared in the actual control of the corporation; (2) the shareholder must have engaged in improper conduct in the exercise of control over the corporation; and (3) the shareholder's improper conduct must have caused the plaintiff's inability to obtain an adequate remedy from the corporation.

*Id.* at *2 (citing *Salem Tent & Awning Co. v. Schmidt*, 719 P.2d 899, 903 (Or. Ct. App. 1986)).

The plaintiff asserts that the laws of these states differ from that of Delaware, insofar as they do not require actual proof of fraud. But, as set forth above, Delaware law does not require proof of actual fraud either. In other words, under the laws of all of these states, a plaintiff seeking to pierce the corporate veil must, at a minimum, establish both that the entity whose corporate veil they seek to pierce and the entities they seek to hold liable disregarded corporate form and effectively operated as a single economic entity and that they did so in order to perpetrate some fraud or injustice.

> b)      *Whether the SAC Adequately Alleges Facts to Support the*
> *RDO Defendants' Alter Ego Liability for CRF's Alleged Misdeeds*

Regarding the first prong of the alter ego test under Delaware law, the RDO defendants assert that the SAC does not allege any specific *facts* that, if true, would serve to establish that RDO Farms, RDO North Dakota or RDO Northwest functioned as the alter ego of CRF, despite Pictsweet's already having conducted substantial discovery in the *Coffelt* case. In response, Pictsweet argues, first, that "the nature and extent of the dominion and control exercised by a parent company over its subsidiary is a *question of fact*" that is "not subject to disposition under Rule 12 on a motion to dismiss." (Doc. No. 124, at 7 (citing *Blair v. Infineon Techs. AG*, 720 F. Supp. 2d 462, 473 (D. Del. 2010)) (emphasis added by the plaintiff).) Based on this rationale, it asserts that it "need not address" the arguments concerning the "single economic entity" prong in "significant detail." (*Id.*)

The plaintiff's reliance on *Blair* is misplaced. First, "courts routinely consider, and grant, motions to dismiss for failure to allege facts sufficient to support the imputation of liability on an alleged alter ego." *In re Washington Mut., Inc.*, No. 08-12229 MFW, 2010 WL 3238903, at *11 (Bankr. D. Del. Aug. 13, 2010), *aff'd*, No. BR 08-12229 (MFW), 2017 WL 2256965 (D. Del. May 23, 2017), *aff'd*, 741 F. App'x 88 (3d Cir. 2018). *Blair* does not hold to the contrary. The fundamental question, ultimately, is whether the plaintiff's pleadings satisfy the plausibility standard established by the Supreme Court in *Iqbal* and *Twombly*. Moreover, the plaintiffs in *Blair* brought ERISA claims, and the court there noted that, "[f]or reasons of public policy, the alter ego standard for piercing the corporate veil is often more lenient for causes of action arising under ERISA." 720 F. Supp. 2d at 471.

Regardless, in this case, while the allegations in the SAC are largely conclusory and overly general, Pictsweet does allege facts suggesting that several of the factors relevant to the "single

economic entity" analysis are present, including inadequate capitalization, insolvency, and the siphoning of funds. In addition, it alleges that the siphoning of funds occurred in order to work an unfairness. More specifically, the SAC alleges that CRF was required to seek and obtain approval from RDO Farms for any and all capital improvements, that it began requesting funding for food safety capital improvements as early as September 2013, but that CRF was unable to obtain the approval or the funding for the capital improvements that would have prevented the *Listeria* outbreak that is at the heart of this lawsuit. (SAC ¶¶ 61, 63.) These factual allegations give rise to a reasonable inference that CRF was undercapitalized, in that it was unable to make the capital expenditures necessary to the safe operation of its business, and that the RDO defendants were aware of that fact. The SAC also alleges, as part of its breach of contract claim, that CRF failed to maintain adequate insurance and to name Pictsweet as an additional named insured, thus harming it. (SAC ¶ 111.) By inference, this allegation, too, suggests that CRF was undercapitalized.

In addition, the SAC alleges that, while they were aware of CRF's obligation to defend and indemnify Pictsweet against its losses arising from the product recalls, the RDO defendants "abus[ed] their power as owners of CRF and operators of the Pasco facility, including by dissipating CRF's assets . . . so as to protect and preserve their own interests and to avoid CRF having to fulfill its . . . obligations to Pictsweet." (*Id.* ¶ 67.) The SAC asserts that, after learning about the recall, the RDO defendants caused CRF to dissipate its assets by making "distributions of capital" to the RDO defendants, thereby reducing its own equity by "almost $100 million." (*Id.* ¶ 68.) While the RDO defendants dispute both the intent and the effect of the underlying transaction to which the plaintiff refers, its arguments essentially raise questions of disputed fact that must be resolved on summary judgment or at trial.

Regarding the second prong of the test, the plaintiff alleges that the purpose of this distribution of CRF's assets was "to commit a fraud upon Pictsweet and to cause injury and damages to Pictsweet (*id.* ¶ 69), by rendering CRF unable to satisfy its obligations to Pictsweet. While the SAC is not a model of clarity, the court finds, at this juncture, that it adequately alleges claims against the RDO defendants based on a theory that they are alter egos of CRF and liable on that basis for some of CRF's alleged wrongdoing.

<em>c) Whether the SAC Adequately Alleges that the RDO Defendants Were Alter Egos of Each Other</em>

The SAC also alleges that the RDO defendants "were and are alter egos of each other, such that RDO Farms, RDO North Dakota and RDO Northwest are legally responsible for the liability of each other." (Doc. No. 104 ¶ 49.) The SAC alleges very generally that the RDO defendants "exercised complete dominion over each other," that none "had a separate mind, will or existence of its own," and that they used each other to "work an injustice and perpetrate a fraud." (*Id.* ¶¶ 50, 51.) The only actual "facts" offered in support of these assertions are that the RDO defendants "held themselves out as the same legal entity," known as "R.D. Offutt Company," used the same office, shared a computer server, employed the same Chief Financial Officer and Human Resources personnel, employed the same "advisors" to obtain and maintain insurance policies, used the same administrative policies and procedures, and provided employee benefits and pension plans under the same umbrella entity known as "R.D. Offutt Company." (*Id.* ¶ 52.)

As the defendants point out, however, the SAC does not contain any actual facts showing that any of the RDO defendants were insufficiently capitalized, failed to observe corporate formalities or keep corporate records, failed to pay dividends to their investors, were at any time insolvent, had funds siphoned from them by a dominant shareholder (as distinct from the funds siphoned from CRF), or operated as a sham or facade. Aside from merely sharing resources and

administrative functions, the SAC does not allege that the RDO defendants' respective officers and directors failed to function independently. As relevant under Oregon law, for purposes of piercing RDO Northwest's corporate veil to reach that entity's parent corporation(s), the SAC does not allege that RDO Northwest would be unable to pay a judgment against it. In short, irrespective of whether the SAC asserts independent claims against any of the RDO defendants, it does not allege any facts establishing that the RDO defendants operated as a single economic entity in order to perpetrate some fraud or injustice, for purposes of showing that they are "alter egos of each other."

In that limited respect, the Motion to Dismiss the alter ego claims will be granted. With respect to the RDO defendants' argument that they cannot be liable under an alter ego theory for any damages that may be assessed against CRF, the motion will be denied.

### 2. *Intentional Misrepresentation and Fraudulent Concealment*

#### a) *General Legal Principles*

Counts Eight and Nine of the SAC, asserted against "all defendants," are for intentional misrepresentation and fraudulent concealment. The claims are premised upon alleged misrepresentations and fraudulent omissions by CRF, relating both to the transaction with Bybee and to the alleged concealment or failure to disclose positive *Listeria* test results at the Pasco facility. (*See* Doc. No. 104 ¶¶ 175–204.) To be clear, CRF has not joined in the portion of the RDO defendants' Motion to Dismiss seeking dismissal of Counts Eight and Nine.

The elements of an intentional misrepresentation claim under Tennessee law are "(1) an intentional misrepresentation of a material fact, (2) knowledge of the representation's falsity, (3) an injury caused by reasonable reliance on the representation, and (4) the requirement that the misrepresentation involve a past or existing fact." *Saltire Indus., Inc. v. Waller, Lansden, Dortch & Davis, PLLC*, 491 F.3d 522, 526 (6th Cir. 2007) (quoting *Kincaid v. SouthTrust Bank*, 221

S.W.3d 32, 40 (Tenn. Ct. App. 2006)). To survive a motion to dismiss, each of these elements must be pleaded with the particularity required by Rule 9 of the Federal Rules of Civil Procedure. *Id.*

Rule 9 requires the plaintiff "(1) to specify the allegedly fraudulent statements; (2) to identify the speaker; (3) to plead when and where the statements were made; and (4) to explain what made the statements fraudulent." *Republic Bank & Tr. Co. v. Bear Stearns & Co.*, 683 F.3d 239, 247 (6th Cir. 2012) (citation omitted). In addition, when a plaintiff pursues fraud claims against multiple defendants, it typically must make "specific allegations as to each defendant's alleged involvement." *N. Port Firefighters' Pension–Local Option Plan v. Fushi Copperweld, Inc.*, 929 F. Supp. 2d 740, 773 (M.D. Tenn. 2013) (Haynes, C.J.). That is, mere "'group pleading' . . . fails to meet . . . [Rule] 9(b)'s specificity requirements." *D.E.&J Ltd. P'ship v. Conaway*, 284 F. Supp. 2d 719, 730 (E.D. Mich. 2003), *aff'd*, 133 F. App'x 994 (6th Cir. 2005).

Fraudulent concealment sounds in fraud and is also subject to Rule 9's particularity requirement. *PNC Multifamily Capital Inst'l Fund XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp.*, 387 S.W.3d 525, 551 (Tenn. Ct. App. 2012). The elements of a fraudulent concealment claim under Tennessee law are

> (1) that [the defendant] concealed or suppressed a material fact, (2) that [the defendant] had a duty to disclose that fact to [the plaintiff], (3) that [the defendant] intentionally concealed or suppressed that fact with the intent to deceive [the plaintiff], (4) that [the plaintiff] was unaware of the fact and would have acted differently if it had known about the concealed fact, and (5) that [the plaintiff] was damaged as a result of the concealment or suppression of the fact.

*Saltire*, 491 F.3d at 527 (citing *Justice v. Anderson Cty.*, 955 S.W.2d 613, 616 (Tenn. Ct. App. 1997)). The Tennessee Supreme Court has long emphasized that a claim of fraudulent concealment will not stand in the absence of an affirmative duty to disclose. *See id.* at 527–28 (quoting *Patten v. Standard Oil Co. of La.*, 55 S.W.2d 759, 761 (Tenn. 1933)); *see also Chrisman v. Hill Home*

*Dev., Inc.*, 978 S.W.2d 535, 538–39 (Tenn. 1998) ("The tort of fraudulent concealment is committed when a party who *has a duty to disclose a known fact or condition* fails to do so, and another party reasonably relies upon the resulting misrepresentation, thereby suffering injury." (citing *Simmons v. Evans*, 206 S.W.2d 295, 296 (Tenn. 1947)) (emphasis added).

> Such a duty to disclose arises only in three circumstances:
>
> 1. Where there is a previous definite fiduciary relation between the parties.
>
> 2. Where it appears one or each of the parties to the contract expressly reposes a trust and confidence in the other.
>
> 3. Where the contract or transaction is intrinsically fiduciary and calls for perfect good faith. The contract of insurance is an example of this class.

*Id.* at 528 (quoting *Patten*, 55 S.W.2d at 761).

> b)    *Intentional Misrepresentation Claim Against RDO Defendants*

In addition to seeking dismissal of the misrepresentation claim on the grounds that they were not CRF's alter egos, which is addressed above, the RDO defendants argue that the SAC fails to state a *direct* claim against them because the SAC does not allege actual false statements by any of the RDO defendants, at least not with the particularity required by Rule 9.

In response, the plaintiff insists that it has alleged that Pictsweet "consented to Bybee's assignment of Pictsweet's contracts to CRF and RDO Northwest based on CRF's, RDO Northwest's and/or RDO Farm's oral and written assurances that Pictsweet also would be going into business with RDO Farms and RDO Northwest." (Doc. No. 124, at 12–13 (quoting Doc. No. 104 ¶ 176).) Such general allegations are not sufficiently particular to satisfy Rule 9. The plaintiff has not identified the actual content of the allegedly fraudulent statements, the speaker, when or where the statements were made, or what made the statements fraudulent. *See Republic Bank*, 683 F.3d at 247.

The plaintiff also asserts that it has clearly alleged that Kevin Sund made alleged misrepresentations "at the direction and approval of Martin Myers, who is the General Manager of the Western Region of RDO Farms and owner of RDO Northwest" and, therefore, has "expressly attributed" Sund's statements to the RDO defendants, as Sund was "acting on behalf of" RDO Farms and RDO Northwest." (Doc. No. 124, at 13.)[7] While the court accepts, for now, that the plaintiff has adequately alleged an alter ego relationship between CRF and its parent corporations, the plaintiff has not otherwise alleged facts showing that Sund, a CRF employee, was acting as an agent of the other defendants.[8]

In short, the plaintiff does not allege sufficiently particularized facts to state a direct-liability claim for intentional misrepresentation against the RDO defendants. Insofar as the plaintiff intends to state a direct misrepresentation claim against the RDO defendants, as opposed to a claim based on their status as alter egos of CRF, such a claim is subject to dismissal, and the defendants' motion will be granted in that respect.

### c) Fraudulent Concealment

Pictsweet's fraudulent concealment claim (asserted as both an intentional misrepresentation claim under Count Eight and as a fraudulent concealment claim under Count Nine) is based primarily on CRF's failure to disclose to Pictsweet the positive *Listeria* tests and PCT scores above 9 and its "delivery protocol." (Doc. No. 104 ¶¶ 178–80, 195.) The RDO defendants argue that the SAC fails to state a fraudulent concealment claim directly against any of

---

[7] RDO North Dakota, the holding company, was not formed until 2016 and therefore was not in existence at the time of these alleged misrepresentations. (*See* Doc. No. 104 ¶ 3.)

[8] Because CRF has not moved for dismissal of the intentional misrepresentation claim against it, and the plaintiff alleges other misrepresentation claims against CRF directly, the court does not feel it necessary, at this juncture, to address whether these alleged misrepresentations by Kevin Sund actually qualify as false statements of fact.

them, because Pictsweet has not shown that any of them owed a legal duty to make any disclosures to it.

The court agrees. Pictsweet alleges that "[t]he 2009 Supply Agreement (as modified by CRF's Continuing Guaranty), the Green Peas Purchase Orders and the Green Beans Purchase Orders constitute valid and enforceable contracts between Pictsweet and CRF." (Doc. No. 104 ¶ 107.) Although the SAC asserts that Pictsweet "reposed trust and confidence in . . . RDO Northwest and RDO Farms" (Doc. No. 104 ¶ 182), it does not allege facts remotely suggesting the existence of a fiduciary relationship between Pictsweet and the RDO defendants, an inherently fiduciary transaction between them, or even a contractual relationship—much less one that would justify the reposing of such trust and confidence. As a result, Pictsweet cannot show that the RDO defendants had a duty to disclose to it a known fact or condition, a necessary element of its fraudulent concealment claim against them directly. *Chrisman*, 978 S.W.2d at 538–39.

Thus, to the extent the SAC is attempting to state a direct claim for fraudulent concealment against the RDO defendants, as opposed to a claim based on their status as alter egos of CRF, such a claim is subject to dismissal, and the defendants' motion will be granted in that respect.

> 3. *Trade Libel*

All of the defendants, including CRF, contend that the trade libel claim should be dismissed because it is barred by the one-year statute of limitations and Tennessee's economic loss doctrine and because the SAC fails to allege sufficient facts to state a claim for trade libel under Rule 12(b)(6). Because the court finds that the SAC fails to state a colorable claim for trade libel, this claim will be dismissed as to all defendants.[9]

---

[9] The court does not reach the defendants' arguments that the claim is barred by the statute of limitations or the economic-loss doctrine.

Libel is written defamation. *Quality Auto Parts Co. v. Bluff City Buick Co.*, 876 S.W.2d 818, 820 (Tenn. 1994). Assuming Tennessee courts would recognize a claim for trade libel in the first place, such a claim, "like a claim for defamation, . . . must be based on a false statement." *McCord v. HCA Health Servs. of Tenn., Inc.*, No. M2014-00142-COA-R3-CV, 2015 WL 1914634, at *8 n.18 (Tenn. Ct. App. Apr. 27, 2015) (citing *Moore Constr. Co. v. Story Eng'g Co.*, No. 01A01-9606-CV-00267, 1998 WL 382198, at *4 (Tenn. Ct. App. July 10, 1998)); *see also Seaton v. Trip Advisor LLC*, 728 F.3d 592, 602 (6th Cir. 2013) ("To the extent that Tennessee common law recognizes trade libel and injurious falsehood as causes of action, such claims require proof of the publication of a false statement of fact."). In addition, a trade libel/disparagement claim "requires a company to make false, derogatory, or disparaging communications *about a competitor's product*." *S. Bertram, Inc. v. Citizens Ins. Co. of Am.*, 657 F. App'x 477, 481 (6th Cir. 2016) (citations omitted) (emphasis in original); *see also Travelers Prop. Cas. Co. of Am. v. Hillerich & Bradsby Co.*, 598 F.3d 257, 269 (6th Cir. 2010) (stating that, under Kentucky law, to prove disparagement/trade libel, the plaintiff must show that the defendant "publishe[d] a false statement that disparages 'the quality of [plaintiff's] land, chattels or intangible things" (quoting *Kenney v. Hanger Prosthetics & Orthotics, Inc.*, 269 S.W.3d 866, 873 (Ky. Ct. App. 2007))).

The SAC does not allege that CRF made any statements about *Pictsweet's* product; rather, Pictsweet alleges only that, sometime in 2016, after the investigation by the CDC and FDA, CRF "issued a series of voluntary nationwide recalls of its frozen vegetable products." (Doc. No. 104 ¶ 88.) The first recall involved only eleven products, none of which "related to Pictsweet." (*Id.*) However, the second expanded recall "impacted 432 products and included Pictsweet products." (*Id.*) CRF allegedly knew that, "once it issued its recall, Pictsweet would be obligated to issue its own recall, which would communicate to Pictsweet's customers that the product Pictsweet had

delivered was contaminated and not merchantable." (*Id.*) In other words, it was Pictsweet's *own recall* that communicated to its consumers false and disparaging information about Pictsweet's products, not CRF's recall. CRF's recall, necessary or not, was only about its own product. *Accord S. Bertram, Inc.*, 657 F. App'x at 481 ("Bertram insists that its publication of the FDA's recall notice is the requisite false statement, but that argument misunderstands the nature of a disparagement claim. The recall notice is a true statement about Bertram's own product, not a false or disparaging statement about Eden Foods' products, and so it cannot serve as the basis for a disparagement claim."); *see also Duramax Marine LLC v. Travelers Indem. Co. of Ill.*, 107 F. App'x 465, 466 (6th Cir. 2004) (applying Ohio law and holding that statements about a company's own products, even when false, cannot be the basis for libel, slander, or disparagement claims).

The mere fact of a recall does not establish that the defendant made false assertions of fact that a particular product was dangerous or contaminated. Moreover, the SAC does not contain any factual allegations showing that the recall mentioned Pictsweet at all. In the absence of more specific allegations regarding actual false statement(s) concerning *Pictsweet's products*, the court cannot find that the SAC states a claim for trade libel based on CRF's product recall.

The plaintiff's conclusory assertions that its products were disparaged by CRF's voluntary recall amount to no more than the "legal conclusions" and "[t]hreadbare recitals of the elements of a cause of action" that do not satisfy the plaintiff's obligation to plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678–79. The trade libel claim will be dismissed, as to all defendants, for failure to state a claim for which relief may be granted.

4.  *Lanham Act Claim*

In support of its Lanham Act claim, Pictsweet asserts that, "[a]s a result of expanding the initial recall of 11 products to 432 products, CRF made statements that necessarily would be understood to disparage the quality of Pictsweet's products," that the statements were "made to persons other than Pictsweet and were untrue," that CRF "knew or should have known that Pictsweet's customers and other persons might act in reliance on those statements," thus causing damages to Pictsweet, all in violation of 15 U.S.C. § 1125(a). (Doc. No. 104 ¶¶ 220–26.) As indicated above, Pictsweet has not identified the actual language of the recall.

The Lanham Act provision to which the plaintiff appears to refer states, in relevant part, as follows:

> Any person who, on or in connection with any goods or services . . . uses in commerce any . . . false or misleading description of fact, or false or misleading representation of fact, which—
>
> . . .
>
> (B) *in commercial advertising or promotion*, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(B) (emphasis added). Section 1125(a)(1)(B) "provides the basis for what are generally known as 'false advertising,' 'trade libel,' and 'product disparagement' claims." *Zenith Elecs. Corp. v. Exzec, Inc.*, 182 F.3d 1340, 1347–48 (Fed. Cir. 1999) (citing 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* ("*McCarthy*") § 27:10, at 27–19 to 27–20 (4th ed. 1998)); *see also Jae Enters., Inc. v. Oxgord Inc.*, No. 5:15-CV-228-TBR, 2016 WL

865328, at *5 (W.D. Ky. Mar. 2, 2016); *Veteran Med. Products, Inc. v. Bionix Dev. Corp.*, No. 1:05-CV-655, 2009 WL 891724, at *5 (W.D. Mich. Mar. 31, 2009).

As noted in *McCarthy*, when this provision of the Lanham Act was passed in 1988 as part of the Trademark Law Revision Act, due to concerns about potential impingement on speech protected by the First Amendment, it expressly limited the claims created by the new language to those premised on "commercial advertising or promotion." *See McCarthy* § 27:95 ("The House Committee had serious concerns about how this new federal remedy would impinge on free speech protected by the First Amendment and agreed to this expansion of § 43(a) only after § 43(a) was restricted to 'commercial advertising or promotion' concerning misrepresentations of 'fact.'" (quoting 15 U.S.C.A. § 1125(a)(1)(B))); *see also Jae Enters.*, 2016 WL865328, at *7 (considering whether the speech at issue met the definition of "a commercial advertising or promotion" for purposes of stating a § 1125(a)(1)(B) product disparagement claim).

The defendants argue that the Lanham Act claim fails precisely because Pictsweet "fails to plead that CRF made a statement for commercial advertising or promotion." (Doc. No. 111-1, at 28.) Instead, by recalling its own products out of "contamination concerns," it "*did the opposite.*" (*Id.* (emphasis in original).) They argue that this claim should be dismissed because it is not the kind of claim that the Lanham Act was intended to address. (*Id.* (citing *CMH Mfg., Inc. v. U.S. GreenFiber, LLC*, No. 3:12-3273, 2013 WL 3324292, at *3 (E.D. Tenn. July 1, 2013)).)[10]

In response, the plaintiff argues that it may be "reasonably inferred" from the SAC that the recall notice was for "commercial advertising or promotion" purposes and, further, that the Sixth Circuit has "previously affirmed the validity of claims for false advertising based on a recall

---

[10] The defendants also argue that the claim is barred by the statute of limitations or the economic-loss doctrine. The court does not reach these arguments.

notice." (Doc. No. 124, at 24–25 (citing *Innovation Ventures, LLC v. N.V.E., Inc.*, 694 F.3d 723 (6th Cir. 2012)).) It asserts, broadly, that it has pleaded "facts plausibly establishing that the recall notice was equivalent to an advertisement." (*Id.* at 25.)

In *Innovation Ventures*, the "recall" was not remotely analogous to the one at issue in this case. There, the plaintiff, the manufacturer of the "5-hour ENERGY" energy shot, brought suit against N.V.E., the creator of the "6 Hour POWER" energy shot, asserting claims for trademark infringement in violation of the Lanham Act. *Innovation Ventures*, 694 F.3d at 726–27. However, prior to bringing this lawsuit, the same plaintiff had been involved in two separate lawsuits against two entirely different energy-shot manufacturers concerning products labeled "6 Hour Energy Shot" and "6 Hour ENERGY!" *Id.* at 733. In the suit against the manufacturer of the "6 Hour Energy Shot," the district court had granted the plaintiff's motion for preliminary injunction and issued a "recall order enjoining the sale of '6 Hour Energy Shot,'" based on the plaintiff's trade dress claim, but not its trademark infringement claim. *Id.* at 734. The plaintiff did not believe the court's recall order was widely enough distributed by the manufacturer of that product, so it "took it upon itself to send an additional recall notice . . . to 110,000 convenience stores and truck stops and to place a notice in retailer magazines." *Id.* It was the language of the plaintiff's "recall notice" concerning a product manufactured by another competitor and distributed in the wake of the earlier suit that formed the basis for N.V.E.'s counterclaim in *Innovation Ventures*.

The recall notice, which is quoted in full in the Sixth Circuit's opinion, referenced a "'6 HOUR' SHOT," gave notice that the plaintiff had "won a decision against a '6 Hour' energy shot," and directed recipients of the "recall" that, if they had "any of the '6 Hour' energy shots" in their possession, they should contact the product's manufacturer or distributor to "return the product immediately," but should not return any "5-HOUR ENERGY®." *Id.* The notice did not expressly

identify the manufacturer of the shot against which the plaintiff had won a decision or acknowledge that there were multiple similarly named "6 Hour" energy shots on the market. The defendant in *Innovation Ventures*, N.V.E., asserted that the recall notice distributed by the plaintiff constituted false advertising in violation of § 1125(a)'s prohibition against "us[ing] in commerce any word, term, name, symbol, or device . . . which . . . in *commercial advertising or promotion*, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities." *Innovation Ventures*, 694 F.3d at 735 (quoting 15 U.S.C. § 1125(a)(1)(B)) (emphasis added).

In addressing this counterclaim, the Sixth Circuit noted that "[l]iability arises" under this provision "if the *commercial message or statement* is either (1) literally false or (2) literally true or ambiguous, but has the tendency to deceive customers." *Id.* (quoting *Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck Consumer Pharm. Co.*, 290 F.3d 578, 586 (3d Cir. 2002)) (emphasis added). Because there was no dispute in that case that the notice constituted "commercial advertising or promotion," the court focused its attention on whether the message was either false or misleading.

The same is not true in this case. The plaintiff here, first, has not actually shown that CRF issued a recall notice that was either literally false or misleading, about either its own product or Pictsweet's, largely because Pictsweet has never identified the recall language to which it objects. More importantly, however, for purposes of the Motion to Dismiss, the court finds that the recall issued here—in response to an investigation by the CDC and FDA and which, as alleged by the SAC, concerned only CRF's products—clearly did not constitute commercial advertising or promotion of CRF's product but instead *recalled it*. Even if the court assumes that the recall was "misleading," insofar as it allegedly extended to products of its own that CRF actually knew were

not contaminated, this is simply "not the kind of misrepresentation prohibited by the [Lanham] Act." *CMH Mfg., Inc. v. U.S. GreenFiber, LLC*, No. 3:12-273, 2013 WL 3324292, at *2 (E.D. Tenn. July 1, 2013); *see id.* (dismissing Lanham Act claim where the plaintiff did not allege that the defendant "misrepresented the nature, characteristics, qualities or origins" of its product but instead alleged that it "misrepresented the federal regulations governing how [its product] should be installed").

The Lanham Act false advertising/product disparagement claim will be dismissed as to all defendants for failure to state a claim for which relief may be granted.

### 5. *Tennessee Consumer Protection Act*

The Tennessee Consumer Protection Act of 1977 ("TCPA"), Tenn. Code Ann. §§ 47-18-101 through -116, expressly provides that it is to be "liberally construed" "[t]o protect consumers and legitimate business enterprises from those who engage in unfair or deceptive acts or practices in the conduct of any trade or commerce in part or wholly within this state." *Id.* § 47-18-102(2). The statute provides a non-exclusive list of fifty-two practices that are "declared to be unlawful," *id.* § 47-18-104(b), including, as relevant here, "[r]epresenting that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another," and "[d]isparaging the goods, services or business of another by false or misleading representations of fact," *id.* § 47-18-104(b)(7) & (8).

The Tennessee Court of Appeals has stated that

> [t]he scope of the TCPA is much broader than that of common-law fraud. Under the TCPA, a consumer can obtain recovery without having to meet the burden of proof that is required in common-law fraud cases, and the numerous defenses that are available to the defendant in a common-law fraud case are simply not available to the defendant in a TCPA case. Misrepresentations that would not be actionable as common-law fraud may nevertheless be actionable under . . . the TCPA. Claims under the TCPA are not limited to misrepresentations that are fraudulent or willful.

Instead, the TCPA applies to any act or practice that is unfair or deceptive to consumers.

*Tucker v. Sierra Builders*, 180 S.W.3d 109, 115 (Tenn. Ct. App. 2005) (internal citations omitted). At the same time, somewhat confusingly, Tennessee courts have also recognized that, at least where TCPA claims are premised upon intentional misrepresentations and fraudulent concealment, they must be pleaded with the particularity required by Rule 9 of the applicable procedural rules. *See, e.g.*, *Harvey v. Ford Motor Credit Co.*, 8 S.W.3d 273, 275 (Tenn. Ct. App. 1999) ("This Court has applied Rule 9.02 to claims under the T.C.P.A."); *see also Davis v. McGuigan*, 325 S.W.3d 149, 174 (Tenn. 2010) (Koch, J., dissenting) (citing Harvey, 8 S.W.3d at 275 (Tenn. Ct. App. 1999); *Humphries v. West End Terrace, Inc.*, 795 S.W.2d 128, 132 (Tenn. Ct. App. 1990)); *Walker v. Frontier Leasing Corp.*, No. E2009-01445-COA-R3-CV, 2010 WL 1221413, at *5 (Tenn. Ct. App. Mar. 30, 2010).

A "deceptive" act or practice under the Act is "'one that causes or tends to cause a consumer to believe what is false or that misleads or tends to mislead a consumer as a matter of fact.'" *Audio Visual Artistry v. Tanzer*, 403 S.W.3d 789, 810 (Tenn. Ct. App. 2012) (quoting *Tucker*, 180 S.W.3d at 116). An act or practice may be deemed "unfair" if it "'causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition.'" *Id.* (quoting *Tucker*, 180 S.W.3d at 116–17). In order to recover under the TCPA, a plaintiff must prove that: (1) the defendant engaged in an unfair or deceptive act; and (2) the defendant's conduct caused an ascertainable loss of money or property. *Id.* As to the second element, "the alleged 'unfair or deceptive act or practice' must in fact cause the damages of which plaintiff complains." *White v. Early*, 211 S.W.3d 723, 743 (Tenn. Ct. App. 2006).

Pictsweet's TCPA claim is premised upon allegations that the "defendants," collectively, (1) represented that the goods CRF sold to Pictsweet "had characteristics they did not have" when they "falsely represent[ed] to Pictsweet, regulators and the public" that the frozen products it sold to Pictsweet were contaminated by *Listeria* and subject to recall, despite actual knowledge that at least some of the products in question were not contaminated; (2) represented that CRF had an affiliation or connection with RDO Farms and/or RDO Northwest that the defendants "later disclaimed"; (3) disparaged Pictsweet and its products by "false and misleading representations that the frozen green peas and green beans marketed by Pictsweet were contaminated by [*Listeria*] and subject to recall"; and (4) represented that the products sold to Pictsweet were wholesome and fit for human consumption when they knew, prior to delivery, that some of the products were contaminated by *Listeria*. (Doc. No. 104 ¶ 236.)

Pictsweet's theory is that the RDO defendants are liable for CRF's actions based on their being alter egos of CRF; based on their being CRF's parent company, holding company, and majority holder; and that they "acted in a concerted effort to take the actions violating the TCPA." (Doc. No. 104 ¶¶ 238–39, 241.) The defendants move for dismissal of this claim altogether on the grounds that it is barred by the statute of limitations and the economic loss doctrine and that the SAC fails to state a TCPA claim for which relief may be granted.

a)      *Statute of Limitations*

Actions to enforce the TCPA are subject to a one-year statute of limitations, which begins to run upon "a person's discovery of the unlawful act or practice" upon which the action is premised. Tenn. Code Ann. § 47-18-110. Under this "discovery rule," "[a] cause of action under the TCPA 'accrues when the action giving rise to the claim is discovered.'" *Almanza v. Baird Tree Serv. Co.*, No. 3:10-CV-311, 2012 WL 4758276, at *7 (E.D. Tenn. Oct. 5, 2012) (quoting *Heatherly v. Merrimack Mut. Fire Ins. Co.*, 43 S.W.3d 911, 916 (Tenn. Ct. App. 2000)). That is,

the "cause of action accrues when the plaintiff knows or in the exercise of reasonable care and diligence should know that an injury has been sustained as a result of wrongful or tortious conduct by the defendant." *Id.* (quoting *John Kohl & Co. v. Dearborn & Ewing*, 977 S.W.2d 528, 532 (Tenn. 1998)). "Although the determination of the time when a plaintiff discovers or reasonably should have discovered a cause of action is typically a question of fact, accrual can be a question of law for the court when undisputed evidence can lead to only one conclusion." *Best Choice Roofing & Home Improvement, Inc. v. Best Choice Roofing Savannah, LLC*, 446 F. Supp. 3d 258, 274 (M.D. Tenn. 2020) (Campbell, J.) (citing *Montesi v. Nationwide Mut. Ins. Co.*, 970 F. Supp. 2d 784, 789–90 (W.D. Tenn. 2013)).

The defendants assert that, insofar as Pictsweet's TCPA claim is premised upon CRF's 2016 recall, which "disparaged" Pictsweet's products, despite the defendants' actual knowledge that some of the products sold to Pictsweet and later recalled were not actually contaminated with *Listeria*, any such claim expired in 2017, well before this lawsuit was originally filed in 2018.[11] In response, Pictsweet points out that its TCPA claim is not based on the recall *per se*, but on its allegation that the defendants' recall notice "knowingly *misrepresented* that Pictsweet's products were contaminated with [*Listeria*]." (Doc. No. 125, at 26.) The plaintiff claims not to have learned about that "misrepresentation" until March 2018, during the course of discovery in *Coffelt*. Likewise, insofar as its claim is premised upon CRF's selling it adulterated products, Pictsweet alleges that it did not know until March 2018 that CRF *knowingly* sold it products that were contaminated and not fit for human consumption.

---

[11] The RDO defendants represent that CRF and Pictsweet entered a tolling agreement that preserved claims that existed as of the date of the tolling agreement, September 11, 2017, but that these three claims expired in May 2017 and were already time-barred when the parties executed the tolling agreement.

Based on the plaintiff's allegations about when it reasonably discovered CRF's deceptive conduct, the court cannot conclude that the TCPA claim is time-barred, insofar as it relates to either the contaminated products or unnecessary recall of non-contaminated product are time-barred.

b)      *The Economic Loss Doctrine*

Broadly speaking, Tennessee has recognized the economic loss doctrine in the products liability context, holding that the rule "precludes recovery in tort when a product damages itself without causing personal injury or damage to other property." *Lincoln Gen. Ins. Co. v. Detroit Diesel Corp.*, 293 S.W.3d 487, 489 (Tenn. 2009).

Regarding the defendants' arguments that the TCPA claim and other claims are barred by the economic loss doctrine, the court notes only that the defendants do not supply any authority for the dismissal of intentional torts under the economic loss doctrine. In addition, another judge of this district has held that the economic loss doctrine does not bar claims under the TCPA. *See Tungate v. Volvo Trucks of N. Am., LLC*, No. 3:09-0579, 2009 WL 4249200, at *2 (M.D. Tenn. Nov. 24, 2009) (Haynes, J.); *see also Carbon Processing & Reclamation, LLC v. Valero Mktg. & Supply Co*., 694 F. Supp. 2d 888, 907–08 (W.D. Tenn. 2010) (noting generally that "Tennessee courts have not applied the economic loss doctrine to preclude all tort claims involving the sale of goods" and that "[o]ne district court applying Tennessee law has observed that other jurisdictions have not barred claims for intentional torts generally under the economic loss doctrine"), *on reconsideration in other part*, No. 09-2127-STA, 2010 WL 3925261 (W.D. Tenn. Sept. 29, 2010); *see also Metro. Gov't. v. Affiliated Computer Servs., Inc.*, No. 3:07cv0080, 2008 WL 11393151, at *9 (M.D. Tenn. July 17, 2008) (Wiseman, S.J.) ("While the economic-loss doctrine remains difficult to pin down, it is relatively clear that, in Tennessee, damages arising from intentional fraud that falls outside the boundaries of a contract . . . are not precluded by the economic-loss doctrine."); *N5ZX Aviation, Inc. v. Bell*, No. 3-11-0674, 2011 WL 5520973, at *4 (M.D. Tenn.

Nov. 14, 2011) ("The Economic Loss Doctrine does not bar claims based upon . . . fraud . . . ." (citation omitted)).

In the absence of compelling authority to the contrary, the court will not dismiss the plaintiff's TCPA claim based on application of the economic loss doctrine.

c)    *Failure to State a Claim*

The defendants move for dismissal of the TCPA claim insofar as it is premised upon the issuance of a recall, arguing that CRF's voluntary recall is specifically authorized by federal regulation, 21 C.F.R. § 7.46, and that the TCPA expressly provides that it does not apply to "[a]cts or transactions required or specifically authorized under the laws administered by, or rules and regulations promulgated by, any regulatory bodies or officers acting under the authority of this state or of the United States." Tenn. Code Ann. § 47-18-111(a)(1). (*See* Doc. No. 111-1, at 28.)

The plaintiff points out, in response, first, that only part of its TCPA claim is based on the recall. Second, it argues that, in any event, the party seeking to apply the exemption has the burden of proving that it applies, Tenn. Code Ann. § 47-18-111(b), and, regardless of whether federal regulation authorizes recalls, it does not authorize misrepresentations in recall notices about the quality or characteristics of recalled products.

As previously indicated, the plaintiff has never actually identified the misrepresentations in the recall, beyond asserting in a conclusory fashion that the recall included products that CRF actually knew were not contaminated. Even assuming that that fact is true, it does not establish a false or misleading statement in the recall. Regardless, and again assuming that the recall contained false representations about the contamination of CRF products that were not actually

contaminated,[12] the court finds that the issuance of a recall involving a company's own products, which does not mention another manufacturer's products, falls within the scope of § 47-18-111(a)(1) and is not the type of statement that can be the subject of a TCPA claim.

Moreover, insofar as the TCPA claim is premised upon false representations in the recall *about Pictsweet*, although Pictsweet states in its Response to the Motion to Dismiss that the SAC "alleges that Defendants' recall notice knowingly *misrepresented* that Pictsweet's products were contaminated with [*Listeria*]" (Doc. No. 124, at 26 (citing Doc. No. 104 ¶ 236)), the SAC does not make any such allegation. In Paragraph 236 of the SAC, Pictsweet alleges that CRF falsely represented that "the frozen green peas and green beans supplied by CRF to Pictsweet were contaminated with [*Listeria*] and subject to recall." (Doc. No. 104 ¶ 236.) In the fact section of the SAC, Pictsweet alleges only that CRF knew that, once it recalled its own products, Pictsweet would be obligated to issue its own recall of its products containing CRF's products, and it was this action—Pictsweet's own recall—that had the effect of "communicat[ing] to Pictsweet's customers that the product Pictsweet had delivered was contaminated and not merchantable." (Doc. No. 104 ¶ 88.)

In sum, insofar as the TCPA claim is premised upon CRF's recall, it is subject to dismissal for failure to state a claim for which relief may be granted.

### d) Failure to State a Claim Against RDO Defendants

The RDO defendants do not seek dismissal for failure to state a claim of the remainder of Pictsweet's TCPA claim—related to CRF's alleged misrepresentations regarding its affiliation with the RDO defendants and CRF's knowing provision of contaminated and adulterated products

---

[12] As the defendants point out, Pictsweet utterly fails to explain why CRF would intentionally recall products that it knew were not actually or potentially contaminated.

to Pictsweet while representing that they were wholesome and fit for human consumption. The RDO defendants do, however, argue that this claim should be dismissed insofar as it is asserted directly against the RDO defendants.

The court will not address again the RDO defendants' alter ego arguments. However, the court finds that, insofar as Pictsweet is attempting to state a claim directly against the RDO defendants based on the SAC's conclusory assertions that the defendants are liable for CRF's actions because they were CRF's parent company, holding company, and majority holder, and that they "acted in a concerted effort to take the actions violating the TCPA" (Doc. No. 104 ¶¶ 238–39, 241), the effort fails. As discussed in the context of the alter ego claims, merely being the parent company does not make the parent liable for the acts of a subsidiary. *See Corrigan v. U.S. Steel Corp.*, 478 F.3d 718, 724 (6th Cir. 2007) ("A parent corporation generally is not liable for the acts of its subsidiary, even if its subsidiary is wholly owned." (citing *United States v. Bestfoods*, 524 U.S. 51, 61 (1998)). Insofar as the plaintiff intends to assert a TCPA claim directly against the RDO defendants based on Kevin Sund's alleged misrepresentations, the claim fails for the same reasons that the intentional misrepresentation claim against them fails: the plaintiff provides no basis for a finding that Sund acted as the agent of any other defendant.

While there remains an open question as to the RDO defendants' alter ego liability for *CRF's* alleged violation of the TCPA, to the extent these defendants seek dismissal of the TCPA claim asserted directly against them, the motion will be granted.

## IV.    CONCLUSION

For the reasons set forth herein, the plaintiff's Motion to Strike will be denied, and the Motion to Dismiss will be granted in part and denied in part.

An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge